# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **vs.** ) | **PRESENTENCE INVESTIGATION REPORT** |
| ) | |
| ) | **Docket No.:**   0973 2:13CR00484-11 |
| **Claudia Garcia** ) | |
| ) | |

**Prepared for:**   The Honorable Christina A. Snyder
United States District Judge

**Prepared by:**   Pamela Chen
USPO
Los Angeles, CA
213-894-6022
Pamela_Chen@cacp.uscourts.gov

| **Assistant U.S. Attorney** | **Defense Counsel** |
|---|---|
| J. Mark Childs | James S. Bisnow |
| 312 North Spring Street | 427 South Marengo Avenue |
| 14th Floor | Suite 6 |
| Los Angeles, CA 90012 | Pasadena, CA 91101 |
| 213-894-2433 | 626-229-9665 |
| mark.childs@usdoj.gov | jimlaw@pacbell.net |

**Sentence Date:**   March 9, 2015

**Offense:**   <u>**Count 1**</u>:
Conspiracy to possess with intent to distribute and to distribute marijuana
21 U.S.C. § 846, 21 U.S.C. 841(b)(1)(C)
Not more than 20 years imprisonment/$1,000,000.00 fine
(Class C Felony)

**Release Status:**   Date of arrest:  08/06/2013; Released on 08/20/2013 on $200,000 appearance bond with a no justification affidavit of surety by defendant's mother and with a $150,000 (full equity deeded) affidavit of surety with deeding of property, and Pretrial Services Agency supervision.

**Detainers:**   Outstanding failure to appear, Riverside County Superior Court, docket number 17756NL.

**Date Report Prepared:** 1/26/2015                    **Date Report Revised:**

Matters set for compliance, Los Angeles County Superior Court, docket numbers SD623868, 0793711, 0480362A, 1055266, and A190565

**Codefendants:** See report
**Related Cases:** None


## Identifying Data:



**Date of Birth:** December 28, 1975
**Age:** 39
**Race:** White
**Hispanic Origin:** Hispanic origin
**Sex:** Female
**SSN#:** 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
**FBI#:** 610600KC2
**USM#:** 65351-112
**State ID#:** A26935015
**ICE#:** A092691587
**PACTS#:** 135509
**Education:** GED
**Dependents:** 2
**Citizenship:** Citizen of Another Country
**Immigration Status:** Permanent Resident **Country of Birth:** Mexico
**Place of Birth:** Mexico
**Legal Address:** 2656 Arlington Avenue
Los Angeles, California 90018
**Residence Address:** 2656 Arlington Avenue
Los Angeles, California 90018

**Alias(es):** Also Known As: Rico, Claudia Gabriela; Gang Name: Giggles;
Also Known As: Garcia, Claudia Gabriela Rangel

**Alternate IDs:** None.

*Restrictions on Use and Redisclosure of Presentence Investigation Report.* Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing

# G U I D E L I N E   S U M M A R Y

**Case Name**: Claudia  Garcia

**Docket No.**: 0973 2:13CR00484-11

**Guideline Edition**: November 1, 2014

BASE OFFENSE LEVEL:  Guideline:  USSG §2D1.1(a)(5) and (c)(8)    | 24 |

SPECIFIC OFFENSE CHARACTERISTICS    | 0 |

ROLE IN THE OFFENSE    | -3 |

VICTIM ADJUSTMENT    | 0 |

OBSTRUCTION OF JUSTICE    | 0 |

ADJUSTED OFFENSE LEVEL    | 21 |

    MULTIPLE COUNT ADJUSTMENT    | N/A |

    CAREER OFFENDER/CRIM. LIVELIHOOD/
    ARMED CAREER CRIMINAL/REPEAT SEX OFFENDER    | N/A |

    ACCEPTANCE OF RESPONSIBILITY    | -3 |

TOTAL OFFENSE LEVEL    | 18 |

    CRIMINAL HISTORY CATEGORY    | III |

<u>SENTENCING OPTIONS:</u>

GUIDELINE SENTENCE 33 to 41 Months

SUPERVISED RELEASE 3 Years

FINE $6,000 to $60,000

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1. On July 18, 2013, the government filed a seven-count indictment that names Jose Rodriguez-Landa (Rodriguez-Landa), Michael Moreno (Moreno), Fred Anthony Montoya (Montoya), Freddie Montes, (F. Montes), Luis Gerardo Vega (Vega), Manuel Larry Jackson (Jackson), Jimmy Ruben Soto (Soto), Raymond Lozano (Lozano), Efrain Isak Rosales (Rosales), Sonia Apodaca (Apodaca), Claudia **Garcia** (**Garcia**), Adam Rios (Rios), and Omar Hugo Robles (Robles). **Garcia** is named in Counts 1 and 2.

2. On September 18, 2014, **Garcia** pled guilty to count one of the seven-count indictment.

3. Count one alleges that in or about January 2011 to July 18, 2013, **Garcia**, along with Rodriguez-Landa, Moreno, Montoya, F. Montes, Vega, Jackson, Soto, Lozano, Rosales, Apodaca, Rios, Robles, co-conspirator Hugo Montes (H. Montes), and others violated 21 U.S.C. § 846 by conspiring to distribute and possess with intent to distribute methamphetamine and marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 841(b)(1)(B)(vii).[1]

### Written Plea Agreement

4. Pursuant to a written plea agreement, the parties agree to the following guideline factors:

5. Base offense level:   26 [U.S.S.G. §§ 2D1.1(c)(7)]

6. Proposed amendment to U.S.S.G. § 2D1.1:       -2

7. Mitigating role       -3 [U.S.S.G. § 3B1.2]

8. Acceptance       -3 [U.S.S.G. § 3E1.1]

9. With the exception for the above, the parties agree not to seek or argue that any specific offense characteristics, adjustments, or departures relating to the offense level be imposed.

10. The parties also reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines pursuant to the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

11. The government conditionally agrees:

---

[1] The defendant, however, pleaded to 21 U.S.C. § 846, 841(b)(1)(C) and only marijuana.

   a) To move to dismiss the remaining count of the indictment against the defendant. However, the defendant agrees that the Court may consider any dismissed charges for the purposes of sentencing.

   b) To recommend up to a three-level reduction for acceptance of responsibility.

   c) Not to file an information, pursuant to 21 U.S.C. § 851, seeking to increase the defendant's punishment based on her prior drug felony (or felonies).

12.   Count 2, to be dismissed, charged 21 U.S.C. § 841(a)(1), (b)(1)(B)(vii), 18 U.S.C. § 2: Possession with intent to distribute marijuana.

Co-defendant Status (as of January 13, 2015)

13.   Jose Rodriguez-Landa:  Proceedings are pending.

14.   Michael Moreno: Proceedings are pending.

15.   Fred Anthony Montoya: Proceedings are pending.

16.   Freddie Montes: Proceedings are pending.

17.   Luis Gerardo Vega: Proceedings are pending.

18.   Manuel Larry Jackson: Proceedings are pending.

19.   Jimmy Ruben Soto: On November 26, 2014, pled guilty to count one of the indictment. Sentencing scheduled for March 9, 2015.

20.   Raymond Lozano: On September 26, 2014, pled guilty to count one of the indictment. Sentencing scheduled for April 13, 2015.

21.   Efrain Isak Rosales: Proceedings are pending.

22.   Sonia Apodaca: Proceedings are pending.

23.   Claudia **Garcia**: Subject of this report.

24.   Adam Rios: On September 19, 2014, pled guilty to count one of the indictment. Sentencing scheduled for February 26, 2015.

25.   Omar Hugo Robles:  On September 18, 2014, pled guilty to count one of the indictment. Sentencing is pending.

Pretrial Service Adjustment

26.   **Garcia** was arrested on August 6, 2013.  On August 20, 2013, **Garcia** was released on a $200,000 appearance bond with a no justification affidavit of surety by **Garcia**'s mother and a $150,000 (full equity deeded) affidavit of surety with

deeding of property. **Garcia** was ordered to comply with Pretrial Supervision Agency (PSA) supervision.

27. According to PSA records, **Garcia** has complied with the ordered conditions of her release.

### The Offense Conduct

28. Information regarding the offense was obtained from the following: The seven-count indictment; the plea agreement; and the case materials provided by the Assistant United States Attorney (AUSA).

<u>Background</u>

29. Rodriguez-Landa, Moreno, Montoya, Vega, Jackson, Soto, Lozano, Sonia Apodaca, and **Garcia** were members and/or associates of the "Mexican Mafia" or "EME," which is Spanish for the letter "M."

30. The Mexican Mafia is an organized group of individuals that controls much of the distribution of drugs and other criminal activities within the California state prisons, California county jails, and some federal prisons. In addition, outside of prison, the Mexican Mafia exercises control over the criminal activities, including drug trafficking, of Hispanic street gangs throughout Southern California and elsewhere.

31. Members of the Mexican Mafia generally are more senior members of local street gangs in the Southern California area and elsewhere. The majority of Mexican Mafia members and associates are incarcerated in California prisons and jails or in federal prison. Most incarcerated Mexican Mafia members and associates are housed in high-security prisons, including Pelican Bay State Prison (referred to in Spanish coded language as "La Playa Azul" or "La Playa"), the United States Penitentiary in Lewisburg, Pennsylvania, and the Administrative Maximum Facility at the United States Penitentiary in Florence, Colorado.

32. Mexican Mafia members and associates are generally able to organize and direct the activities of other Hispanic prison inmates, including members and associates of Southern California based Hispanic street gangs, who comprise a significant percentage of the inmates within the California penal system. Indeed, Mexican Mafia members and associates wield such power among the prison population that they are able to order that acts of violence be carried out against other prison inmates and against street gang members outside of prison. Because of the substantial power they wield both inside and outside of prison, Mexican Mafia members and associates are able to provide protection and status to other inmates, including inmates who are not members of Hispanic street gangs. Generally, Mexican Mafia members and associates require that inmates who are not members of Hispanic street gangs provide services and/or payments in exchange for protection within prison or jail.

33.    Street gangs controlled by and/or affiliated with the Mexican Mafia generally include the number "13" in their gang name, with the number "13" representing the thirteenth letter of the alphabet, the letter "M." Members and associates of street gangs controlled by and/or affiliated with the Mexican Mafia must pay "taxes" to members and associates of the Mexican Mafia in order to be permitted to maintain control over their territories in order to distribute drugs and engage in other criminal activity, and in order to ensure their protection once gang members enter California prisons or local jails. Due to their control over Hispanic street gangs, Mexican Mafia members and associates are able to direct the drug trafficking activities of Hispanic street gangs, including what territories or areas they are permitted to distribute drugs. Mexican-Mafia members and associates also provide permission to distribute drugs and protection inside and outside prison to other criminal groups who provide them with services and/or payments, including Mexico-based drug cartels.

34.    Since the majority of Mexican Mafia members are incarcerated, Mexican Mafia members and associates in prisons or jails send instructions to local street gangs and other Mexican Mafia members and associates, both inside and outside prison and jail, via telephone calls, prison-system e-mails, letters, including letters mailed to fictitious individuals, and "kites," which are notes smuggled by prisoners. Mexican Mafia members and associates generally use coded language in order to conceal the true nature of their discussions with and instructions to criminal associates. In order to pass on instructions and information from prison and jail, Mexican Mafia members and associates often rely on trusted female associates (known as "secretaries") who communicate with the incarcerated Mexican Mafia members and associates and relay their instructions to others. These secretaries are often treated as respected criminal figures by members of street gangs controlled by and/or affiliated with the Mexican Mafia.

35.    F. Montes, Rosales, Rios, Robles, co-conspirator Hugo Montes (H. Montes), and others were members and associates of "La Familia Michocana" drug cartel and its successor the "Knights Templar" drug cartel (in Spanish, "Los Caballeros Templarios") (hereinafter, both referred to as "La Familia").

36.    La Familia is a large-scale drug cartel and organized crime syndicate based in the Mexican state of Michoacan, Mexico. La Familia is responsible for the trafficking of hundreds of thousands of pounds of controlled substances, including methamphetamine, from Mexico into the United States, and it controls drug trafficking routes throughout Mexico for the purpose of smuggling drugs into the United States. La Familia has been previously allied with other major drug cartels in Mexico to augment its power and influence in the drug trade.

Roles of the Conspirators

37.    F. Montes, Rosales, Rios, Robles, coconspirator H. Montes, and other members and associates of La Familia distributed and coordinated the distribution of

methamphetamine and marijuana to others in the Southern California area, including Los Angeles County.

38.     Rodriguez-Landa, Moreno, Montoya, Vega, Jackson, Soto, Lozano, Apodaca, and other members and associates of the Mexican Mafia, assisted, facilitated, and aided the possession with intent to distribute and distribution of drugs by members and associates of La Familia by ordering, instructing, and informing Hispanic gang members to protect La Familia drug shipments and sales, to prevent criminal taxation of La Familia drug shipments and sales, and to collect drug debts.

39.     Rodriguez-Landa, Moreno, Montoya, Vega, Jackson, Soto, Lozano, Apodaca, and other members and associates of the Mexican Mafia assisted, facilitated, and aided the possession with intent. to distribute and distribution of drugs by members and associates of La Familia drug cartel by protecting and arranging for the protection of incarcerated members and associates of La Familia from violence and criminal taxation.

40.     In exchange for the Mexican Mafia's services and protection, members and associates of La Familia, including F. Montes and co-conspirator H. Montes, provided thousands of dollars in drug proceeds and pound-quantities of methamphetamine and marijuana at a discounted price to members and associates of the Mexican Mafia.

41.     Rodriguez-Landa, Moreno, Soto, Montoya, Vega, Jackson, Lozano, Apodaca, **Garcia**, and other members and associates of the Mexican Mafia communicated, including via telephone and in-person meetings, with members and associates of La Familia, in order to discuss how the Mexican Mafia could facilitate the possession with intent to distribute and distribution of drugs by members and associates of La Familia within the United States.

42.     Moreno, Montoya, Vega, Jackson, Soto, Lozano, Apodaca, and other members and associates of the Mexican Mafia distributed, sent, and arranged the delivery of drug proceeds provided by members and associates of La Familia to incarcerated members of the Mexican Mafia.

43.     F. Montes, Lozano, Apodaca, coconspirator H. Montes, and others facilitated communications between members and associates of La Familia to incarcerated Mexican Mafia members and associates.

44.     Moreno, Montoya, Soto, Lozano, and Apodaca facilitated communications about the drug trafficking alliance of La Familia and the Mexican Mafia between incarcerated Mexican mafia members and out-of-custody Mexican Mafia members and associates.

45.     Soto picked up and delivered proceeds derived from the sale of drugs supplied by R. Montes.

46.   **Garcia**, at the direction of Vega, transported controlled substances and drug proceeds, and communicated messages about drug transactions between Vega and others.

47.   Rios and Robles, at the direction of F. Montes, transported to others, including to Vega, methamphetamine sold by La Familia members and associates at a discounted price.

48.   Rios, at the direction of F. Montes, transported drug proceeds.

Role of Garcia

49.   In and around January 2011 to November 2011, **Garcia** agreed and conspired with at least one other person charged in this conspiracy, including, among others, Vega, to distribute, and possess with intent to distribute marijuana. In furtherance of this conspiracy to distribute and possess with intent to distribute marijuana, **Garcia**, at the direction of Vega, transported marijuana and drug proceeds, and communicated messages about drug transactions between Vega and others during the year 2011.

*October 10, 2011*

50.   In a telephone call on October 10, 2011, **Garcia** informed Vega that an unindicted co-conspirator had a problem with drugs that were provided by Vega. When Vega told **Garcia** to inform the unindicted co-conspirator to do the drug deal anyway, **Garcia** agreed to do so.

51.   In a subsequent telephone call, Vega instructed **Garcia** to ask an unindicted co-conspirator if the unindicted co-conspirator had sold the drugs that were provided by Vega. **Garcia** agreed to do so.

*October 11, 2011*

52.   In a telephone call on October 11, 2011, **Garcia** informed Vega that an unindicted co-conspirator, who had received drugs from Vega, would have drug proceeds available for Vega later that evening. Vega told **Garcia** to inform the unindicted co-conspirator to have the money ready to be picked up.

53.   In a subsequent telephone call, Vega informed **Garcia** that he (Vega) was negotiating the price for the purchase of 200 pounds (equivalent to 90 kilograms) of marijuana. In response, **Garcia** agreed to update Vega's drug customer about Vega's pending drug deal.

54.   In a third telephone call, Vega informed **Garcia** that he (Vega) would acquire 300 pounds (equivalent to 136 kilograms) of marijuana the next day. **Garcia** informed Vega of her communications with various drug customers who wanted to purchase marijuana from Vega and **Garcia**.

*October 12, 2011, to October 20, 2011*

55.  From October 12, 2011, to October 20, 2011, there were phone conversations during which **Garcia** and Vega allegedly discussed the storage and/delivery of marijuana on Vega's request and behalf, and the relaying of messages back and forth with an unindicted co-conspirator on Vega's behalf.[2]

**Victim Impact**

56.  There are no identifiable victims in this offense other than societal interests.

**Adjustment for Obstruction of Justice**

57.  The probation officer has no information indicating the defendant impeded or obstructed justice.

**Adjustment for Acceptance of Responsibility**

58.  On January 7, 2015, the Probation Officer interviewed Garcia at the United States Probation Office in Los Angeles, California.  Counsel was present. Garcia said that the factual basis in the plea agreement is true and correct.

59.  Further, the defendant provided the following information regarding acceptance of responsibility:

   a)  In 2008, the defendant was charged in a state case for a possession of controlled substance incident that allegedly occurred in February 2008. In 2009, she pled guilty to transporting or offering a controlled substance for sale. After satisfying the conditions of probation, the charge was reduced to a being under the influence of a controlled substance offense.

   b)  The instant offense originated in August 2011. In wiretaps during the month of October 2011, Vega, who was Garcia's boyfriend at the time, directed Garcia to engage in conduct that is the subject of this case. At the time, Garcia was in the process of divorcing her husband, who was in prison.

   c)  After completing the county jail time imposed in the state case, the defendant began working at Home Boys Industry in June 2012, where she learned about the Tarzana Treatment Center.[3] In October 2012, she enrolled herself into the three-month inpatient residential treatment program in the Tarzana Treatment Center.

---

[2] Conduct alleged in the indictment but not agreed to in the plea agreement.
[3] Beginning date of participation in Homeboy Industries verified by letter of reference from the Executive Director, who described Homeboy Industries as an employment referral center for at-risk and formerly gang-involved youth, and economic development program.

d) After staying at the Tarzana Treatment Center for eight months, she moved to Sleep Tight, a sober living facility.[4] She terminated all associations with gang members. From May 24, 2013, until her arrest for the instant case in August 2013, she was living at the sober living facility. Garcia explained that she enrolled in the Tarzana Treatment Center because she had decided to move away from using drugs so she could be with her children.

### Offense Level Computation

60. The 2014 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

61. **Count 1: Conspiracy to possess with intent to distribute and to distribute controlled substances**

62. **Base Offense Level:** USSG § 2D1.1 is the applicable guideline for a violation of 21 U.S.C. § 846.  As USSG §§ 2D1.1(a)(1) to (a)(4) do not apply, the offense level is determined by the provisions set forth in U.S.S.G. § 2D1.1(a)(5).

63. In a phone call on October 11, 2011, **Garcia** agreed to relay information to Vega's drug customer that Vega was negotiating the price for the purchase of 200 pounds/90 kilograms of marijuana. Later the same day in another phone call, Vega informed **Garcia** that he (Vega) would acquire 300 pounds/136 kilograms of marijuana the next day. **Garcia** informed Vega of her communications with various drug customers who wanted to purchase marijuana from Vega and **Garcia**. During the course of this conspiracy, **Garcia** is accountable for at least 226 kilograms of marijuana because she knew that Vega was dealing in this quantity of marijuana.

64. Pursuant to the Drug Quantity Table set forth in subsection (c), the base offense level is 24 because the defendant's offense involved more than 100 kilograms but less than 400 kilograms of marijuana. USSG §2D1.1(a)(5) and (c)(8). **24**

65. **Specific Offense Characteristics:** None. **0**

66. **Victim Related Adjustment:** None. **0**

67. **Adjustment for Role in the Offense:** USSG § 3B1.2 provides for a two to four-level reduction if the defendant was a minor or minimal participant in any criminal activity. Application Note 3(A) states that this range of

---

[4] Verified by letter from Primary Counselor at Tarzana Treatment Center and letter from Lanita Hamilton of Sleep Tight Tonight Incorporated, who reported that Garcia began residing at Sleep Tight Tonight Transitional Housing in June 2013. According to Lanita Hamilton, Garcia, an on-site manager, was a great role model and great inspiration to the other men and women at the facility. Lanita Hamilton said that Garcia gave back with "such grace and humility."

adjustments applies to a defendant who plays a part in committing the offense that makes her substantially less culpable than the average participant.  This application note further states:

> A defendant who is accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal activity is not precluded from consideration for an adjustment under this guideline. For example, a defendant who is convicted of a drug trafficking offense, whose role in that offense was limited to transporting or storing drugs and who is accountable under § 1B1.3 only for the quantity of drugs the defendant personally transported or stored is not precluded from consideration for an adjustment under this guideline.

68.  Application Note 3(C) in U.S.S.G. § 3B1.2 instructs that "the determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case."

69.  The indictment names members and associates of the Mexican Mafia, along with members and associates of the La Familia drug cartel. Based on the information received, and the defendant's criminal history and personal history, there is no evidence that **Garcia** (who is a known member of "The Magician's Club" (TMC) as evidenced in her criminal history and personal history) was not more than an associate of Vega.

70.  In this two-and one-half year conspiracy that involved 13 named co-conspirators, **Garcia**'s role was limited to relaying messages back and forth between Vega and others on Vega's behalf and direction over the course of one month. These were messages about Vega's drug transactions and drug proceed transactions. There is no evidence that **Garcia** was involved with any of the co-conspirators named in this indictment, other than Vega. Further, the evidence made available to the undersigned does not establish that **Garcia** distributed drugs or transported drug proceeds. Compared with Vega and the other named co-conspirator defendants, **Garcia** was a substantially less culpable participant.

71.  On the other hand, a minimal role reduction for **Garcia** is not appropriate. In multiple phone calls from October 10, 2011, to October 20, 2011, **Garcia** and Vega discussed transactions involving drugs and drug proceeds. **Garcia** knew that Vega was engaged in multi-kilogram marijuana drug transactions. Further, **Garcia** was trusted to communicate messages to Vega's drug purchasers. Based on the extent of her knowledge

and trusted position, she could not be described as a minimal participant in a drug trafficking offense.

72.   Considering the above, a three level role reduction has been applied as **Garcia** is considered to be more than a minimal but less than a minor participant in this drug conspiracy.                                                              **-3**

73.   **Adjustment for Obstruction of Justice:** None.                              **0**

74.   **Adjusted Offense Level (Subtotal):** 21                                    **21**

75.   **Chapter Four Enhancement:** None.                                          **0**

76.   **Acceptance of Responsibility:** The defendant has pleaded guilty and has admitted her involvement in the offense to the Probation Officer. Accordingly, a two-level reduction for acceptance of responsibility has been applied. USSG §3E1.1(a).                                               **-2**

77.   **Acceptance of Responsibility:** The additional one-level reduction applies upon motion of the Government stating that the defendant timely notified authorities of her intention to enter a guilty plea, and provided that the adjusted offense level prior to operation of subsection (a) is level 16 or greater.                                                                  **-1**

78.   **Total Offense Level:** 18                                                 **18**

       **Offense Behavior Not Part of Relevant Conduct:**

79.   None.


## PART B. THE DEFENDANT'S CRIMINAL HISTORY

80.   A criminal record inquiry was conducted through the Justice Data Interface Controller System (JDIC) which accesses several databases on the county, state and national level, including the California driver's license and State Identification Number records maintained by the California Department of Motor Vehicles (DMV), and the Criminal Identification Index record (CII) as maintained by the California Department of Justice. Arrest records and court records were obtained from the following additional sources:  Los Angeles County Court Superior Court – Juvenile, Metropolitan; the Trial Court Inquiry System serving the Los Angeles County Superior Court (TCIS); Los Angeles Police Department (LAPD); and Los Angeles County Sheriff's Department (LASD).

       **Juvenile Adjudication(s)**

81.   None.

**Adult Criminal Conviction(s)**

| | **Date of Arrest** | **Conviction/Court** | **Date Sentence Imposed/Disposition** | **Guideline** | **Pts** |
|---|---|---|---|---|---|
| 82. | 10/13/2004 (Age 28) | 415 PC: Fight/noise/offensive words (Ct. 2)(infr.)/ Los Angeles Co. Sup. Crt., Hollywood, CA; Docket No.: 5HL01269 | 07/07/2005: fine | 4A1.2(c)(1) | 0 |

Court documentation verifies that the defendant was represented by counsel. The count of battery was dismissed.

An arrest report is not available.

| | **Date of Arrest** | **Conviction/Court** | **Date Sentence Imposed/Disposition** | **Guideline** | **Pts** |
|---|---|---|---|---|---|
| 83. | 02/06/2008 (Age 32) | 11350(a) H&S: Use/under influence of controlled subst. (Ct. 8)(fel.)/ Los Angeles Co. Sup. Crt., Central, CA; Docket No.: BA337388 | 12/10/2010: 18 mos. prob., 120 days CJ | 4A1.1(b) 4A1.2(e)(2) | 2 |

Court documentation verifies that the defendant was represented by counsel.

On June 9, 2009, the defendant pled guilty to a felony violation of 11352(a) H&S: transportation/sell controlled substance (count 7). The court sentenced the defendant to 36 months of probation. However, the court agreed that the defendant could have this count of conviction reduced to an 11350 H&S charge if she satisfied all the conditions of probation, and she returned and surrendered to serve 120 days of county jail at the end of the probationary period.

On December 10, 2010, the defendant pled guilty to a violation of 11350(a) H&S: Use/under the influence of a controlled substance (see above). The court vacated the plea and sentence imposed on June 9, 2009.

The court revoked probation on March 3, 2011. On June 15, 2011, the court reinstated probation to June 15, 2014, and modified probation to include the condition that the defendant stay away from TMC 13 gang members.

According to the arrest report, the victim reported that on February 6, 2008, Bibiano Rico approached him (victim), who was standing in front of his residence. After yelling at the victim, Bibiano Rico used a semi-automatic handgun to fire

14

five to seven shots at the victim. Bibiano Rico then fled on foot. The victim was not injured.

Based on this assault with a deadly weapon report, on March 5, 2008, the police officers executed a search warrant at 2662 Arlington Avenue, where Bibiano Rico lived with the defendant. The defendant and Bibiano Rico were present in the residence.  In the defendant's bedroom, there was a baggie containing three MDMA pills inside the dresser, an electronic scale, and $232 in cash. On the living room floor and kitchen area, there was 4.39 grams of rock cocaine base that allegedly were packaged as $5 rocks, $20 rocks, and $40 rocks into four separate packages. In the closet, there was a box of live .38, .357, and 9 mm rounds.

The defendant said that she possessed the rock cocaine base for her personal use.

Pursuant to the search warrant, the police officers also searched a burgundy Dodge Caravan parked on the property. The registered vehicle owner said that Bibiano Rico was the last person who drove the Caravan. Inside the glove box, there was a baggie containing 1.91 grams of rock cocaine base.

The police officer identified Bibiano Rico and the defendant (moniker of Giggles) as members of "The Magician's Club" (TMC).

**Criminal History Computation**

84.    The criminal convictions above result in a subtotal criminal history score of two.

85.    The defendant committed the instant offense while under a criminal justice sentence for Los Angeles County Superior Court, case number BA337388. Therefore, two points are added. USSG §4A1.1(d).

86.    The total criminal history score is four. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of four establishes a criminal history category of III.

**Other Criminal Conduct**

| Date of Arrest | Charge | Agency | Disposition |
|---|---|---|---|
| 87.  02/05/1993 (Age 17) | 459 PC: Burgl. | Los Angeles Police Department | 02/06/1993: Rel. to juvenile hall |

Partial court documentation indicates that the defendant was the subject of this law enforcement contact. Attorney representation is unknown.

An arrest report is not available.

| 88. | 11/12/2005 (Age 29) | 4060 B&P: Poss. of prescription pills w/o prescription (Ct. 1)(misd.), 11375(b)(2) H&S: Poss. of a designated subst. (Ct. 2)(misd.); Los Angeles Co. Sup. Crt., Beverly Hills, CA, Docket No.: 6BV00060 | Los Angeles County Sheriff's Department | 03/10/2006: Dism. interest of justice |

Court documentation verifies that the defendant was represented by counsel.

An arrest report is not available.

| 89. | 02/09/2011 (Age 35) | 186.22(a) PC: Participate in criminal street gang | Los Angeles Police Department | 02/09/2011: Prob. revkd. in lieu of filing |

According to the CII, the defendant was the subject of this law enforcement contact. Attorney representation is unknown.

According to the arrest report, the victim reported that two carjackers exited from a blue Jeep Cherokee, and then carjacked his (victim's) car. While investigating the carjacking report, the police noticed a blue Jeep Cherokee pull into the driveway at 1171 Wilton Place. The defendant was the driver, and Robert Garcia was the passenger. After the defendant parked in the driveway, Robert Garcia exited the jeep and ran into 1171 Wilton Place. A few moments later, Robert Garcia, who was carrying a bag, returned to the jeep. During the subsequent traffic stop of the jeep, the police officer found a loaded semi-automatic .22 caliber handgun and a loaded .22 caliber magazine in a gun case on the floor behind the front passenger seat.

The police officer identified Robert Garcia as a TMC gang member since 2005, and the defendant as a TMC gang member since 1999.

**Pending Charges**

| Date of Arrest | Charge | Agency | Disposition |
|---|---|---|---|
| 90. 11/15/2007 (Age 31) | Unknown; Los Angeles Co. Sup. Crt., Metropolitan, CA, Docket No.: SD623868 | Metropolitan Transit Authority | Matter set for compliance, further action required |

According to the DMV, the defendant is the subject of this law enforcement contact. Attorney representation is unknown.

| | | | |
|---|---|---|---|
| 91. 05/06/2009 (Age 33) | Unknown; Los Angeles Co. Sup. Crt., Metropolitan, CA, Docket No.: 0793711 | Los Angeles Police Department | Matter set for compliance, further action required |

According to the DMV, the defendant is the subject of this law enforcement contact. Attorney representation is unknown.

| | | | |
|---|---|---|---|
| 92. 08/15/2009 (Age 33) | Unknown; Los Angeles Co. Sup. Crt., Metropolitan, CA, Docket No.: 0480362A | Los Angeles Police Department | 04/22/2010: Matter set for compliance, further action required |

According to the DMV, the defendant is the subject of this law enforcement contact. Attorney representation is unknown.

| | | | |
|---|---|---|---|
| 93. 11/15/2009 (Age 33) | 24252(a) VC: Fail. to maintain lighting equipment in good working order; Los Angeles Co. Sup. Crt., Metropolitan, CA, Docket No.: 1055266 | Unknown | 10/20/2010: Matter set for compliance, further action required |

According to the DMV, the defendant is the subject of this law enforcement contact. Attorney representation is unknown.

| 94. | 06/08/2010 (Age 34) | 16028(a) VC: Fail. to provide evidence of financial resp. 24252(a) VC: Fail. to maintain lighting equipment in good working order; Los Angeles Co. Sup. Crt., Metropolitan, CA, Docket No.: A190565 | Unknown | 09/13/2010: Matter set for compliance, further action required |

According to the DMV, the defendant is the subject of this law enforcement contact. Attorney representation is unknown.

| 95. | 08/23/2011 (Age 35) | 22356(b) VC: Speeding more than 70 MPH; Riverside Co. Sup. Crt., Blythe, CA, Docket No.: 17756NL | California Highway Patrol | 01/02/2013: Outstanding FTP |

Court documentation verifies that the defendant is the subject of this law enforcement contact. Attorney representation is unknown.

### Other Arrests

96.   None.

## PART C. OFFENDER CHARACTERISTICS

97.   The following information was obtained from Garcia during a presentence interview conducted on January 7, 2015, and, where noted, verified with supporting documents provided by the defendant.

98.   To date, the undersigned's attempts to contact Garcia's sister, Blanca Garcia (B. Garcia), at (213) 271-0497 (cell) have been unsuccessful.

### Personal and Family Data

99.   On December 28, 1975, Garcia was born Claudia Gabriela Garcia in Mexico.

100.   The defendant's father, Lucas Garcia, is a 57-year-old carpenter living in Dallas, Texas.

101.   The defendant's mother, Blanca Rangel, is a 55-year-old teacher living at the Arlington Avenue address indicated on the face sheet of this report.

102.   Garcia has three siblings, all of whom live in Los Angeles. Blanca Garcia, age 39, is a dental assistant. Juana Garcia, age 37, is a medical biller. Jonathan Garcia, age 29, is a restaurant manager.

103.   Garcia said that she had a fun childhood in a stable household located in a working class neighborhood. She described her family as close knit, and her childhood as "sheltered." Her parents were strict.

104.   Because she believed her parents maintained a "good family," it was a shock when her parents divorced in 1991 when she was 16-years-old. The divorce tore their family apart. In reaction to the divorce, she became a rebellious teenager and runaway. She and her siblings moved back and forth between their mother's strict household and father's relaxed household.

105.   After dating since 2000, the defendant married Bibiano Rico (Rico), a neighborhood boy, on November 7, 2007. After breaking up in 2010, the defendant and Rico are in the process of getting a divorce.[5]

106.   Garcia said that Rico, who began using drugs in 2004, was an abusive partner and husband. After being in and out of jail, Rico went to prison in 2008 to serve a lengthy sentence. Garcia believes that Rico will be deported after he is released from his current prison sentence.

107.   In a prior relationship with Sal Sanchez (Sanchez), the defendant had a healthy son. Damian Sanchez, age 18, is a part-time worker and community college student hoping to attend UCLA. Garcia said that her 18-year-old son had no father-son relationship with Sanchez, who was in and out of prison and then deported in 2012.

108.   With Rico, the defendant has a healthy son. Bibiano Rico is 12-years-old. When Rico was arrested in 2008, her son went through a period of rebellion. More recently, her 12-year-old son has improved his school grades and attitude. Her 12-year-old son is attached to her because they spend a lot of time together.

109.   Garcia is concerned about her two sons as she has been the primary parent. Although he was a decent father, Rico will be deported so her sons cannot rely on him (Rico).

110.   As for residential history, the defendant said that she was born in Mexico. In 1977, her parents brought her to the United States when she was two-years-old.  From 1977 until 1990, she and her family lived in homes located in Hollywood and the mid-city neighborhood in Los Angeles. From 1990 to 1991, she and her family lived in San Bernardino. After her parents divorced in 1991, she moved back and forth between her mother's home in the mid-city neighborhood and her father's home in Montebello and East Los Angeles.

---

[5] In part, verified by copy of dissolution of marriage filing.

111.  On January 15, 2015, the undersigned conducted a home assessment of the Arlington Avenue address, which is located on a busy street in a working class neighborhood. The USPO met with the defendant. Additionally, the defendant's stepfather and oldest son and the family's two dogs were present in the home, which is located on a large lot. On the same property, there are two other housing units, one of which is occupied by the defendant's brother and girlfriend, and another of which is occupied by a tenant. There is a locked gate that surrounds the driveway and the property, which has a well maintained courtyard and garden.

112.  During the home visit on January 15, 2015, the USPO observed that the defendant and her mother, stepfather, and two sons live in a three-bedroom and two-bathroom home. The home was cluttered but clean. The defendant's mother and stepfather share one bedroom, and the defendant's sons each occupy a bedroom. The defendant is sleeping on the sofa in the living room. Garcia explained that she and her mother are awaiting the outcome of the case and her financial ability to pay the rent, before she will be permitted to move into the housing unit currently occupied by the tenant. Garcia said that her mother has owned the Arlington Avenue address since 2002.

113.  When questioned about sources of support, the defendant said that she can rely on her sons and her mother and stepfather. She has a good relationship with her father, who calls on a regular basis. Further, she can depend on her co-workers, case manager, and counselor at Homeboy Industries. On a regular basis, she maintains contact with her drug counselors at Tarzana Treatment Center.

114.  The defendant provided letters of reference – specifically, letters from Homeboy Industries' Executive Director, and staff members (Curriculum Coordinator, Case Manager, and Director of Food and Beverage). The letter writers agree that Garcia is sincere in her desire to redirect her life. The Case Manager reports that Garcia is "taking great strides towards a meaningful future while making the conscious choice to turn away from her previous lifestyle," and "Claudia has achieved a level of self-sufficiency and self-empowerment that is unprecedented for her and will continue to increase." The Director of Food and Beverage reports that Garcia has had near perfect attendance, and "a great attitude and willingness to adapt and change herself," and "Claudia has never said no to anything we have asked her to do and always jumps in to support her teammates."

**Physical Condition**

115.  Garcia stands 5' 1" tall and weighs 139 pounds.  She has brown eyes and black hair. As for identifying marks, Garcia reports that she has four tattoos and a surgical scar on her abdominal area.[6]

116.  As for physical health history, the defendant reports the following:

---

[6] The Program Coordinator of the tattoo program at Homeboy Industries verified that as of September 20, 2013, the defendant had undergone ten tattoo laser treatments to remove her tattoos.

a) In 2005, she underwent surgery to remove a benign tumor from the left side of her stomach. After the tumor removal, she has healed from this ailment.

b) In 2015, she is in the process of scheduling surgery to remove her gall bladder, followed up by a one week surgical recovery period. The surgery is needed because she has suffered from pain in the area of her gallbladder since 2009.

### Mental and Emotional Health

117.    During the interview with the Probation Officer, the defendant displayed no obvious signs of psychological dysfunction.

118.    Since 2013, the defendant has been seeing a counselor at Homeboy Industries once a week.[7] They discuss the stress of dealing with the instant offense, and her divorce from an abusive spouse.

### Substance Abuse

119.    Garcia said that at age 15, she used marijuana a few times, and began drinking alcohol on a regular basis. Over the years, her alcohol intake increased and occurred on a daily basis.

120.    At age 17, the defendant inhaled powder cocaine and powder methamphetamine on a few occasions, smoked heroin twice, used hallucinogens (including LSD and PCP) for a six-month period, and then used crack cocaine. Garcia said that she preferred crack, alcohol and methamphetamine. She became a regular user of crack cocaine.

121.    Beginning at age 17, the defendant began using her drugs of choice, alcohol in combination with crack cocaine, on a daily basis. From age 19 to age 26, she did not use crack cocaine but continued to drink alcohol. She stopped using crack cocaine during her pregnancy with her first son. At age 26, she resumed her crack cocaine use because Bibiano began to use crack cocaine. At age 29, she stopped using crack cocaine but continued to drink alcohol, as much as a 30 pack of alcohol with friends every day. At age 37, she tried using crack cocaine for a few weeks but then she quit when she began working for Home Boys Industry.

122.    From October 2012 to May 2013, the defendant attended the inpatient drug treatment program at Tarzana Treatment Center. Since May 2013, she has attended AA and NA meetings at Homeboy Industries or the Tarzana Treatment Center for two hours each week. She does not need inpatient drug treatment, but,

---

[7] Verified by the Case Manager at Homeboy Industries, who said that Garcia attends an hour of therapy each week with a licensed clinical social worker.

she wants to continue attending AA and NA meetings because they are helpful.[8] She has been clean and sober for 27 months.

123.   In a letter dated September 17, 2013, the Primary Counselor at the Tarzana Treatment Center reported that from October 16, 2012, to May 24, 2013, Garcia attended residential treatment at the Tarzana Treatment Center of Long Beach for chemical dependency.[9] During the treatment program, Garcia tested negative on all drug screenings, and attended individual substance abuse counseling on a weekly basis and psycho-education progress groups. According to the Primary Counselor, Garcia "maintained a consistently high level of participation in her treatment and remained engaged." Further, Garcia was promoted to be an Assistant Senior Elder, who assisted staff in daily operational duties.

124.   From November 2012 to February 2013, Garcia received eight certificates recognizing her services above and beyond her duties in the kitchen, and three certificates recognizing her 1350 hours of volunteer service working in the kitchen at the Tarzana Treatment Center.

## Educational, Vocational and Special Skills

125.   The defendant said that she completed eleven years of schooling. She did not have academic problems and got along with her teachers. However, she stopped attending school after her parents divorced.

126.   In September 2013, the defendant passed the general educational development (GED) test, and earned a high school equivalency certificate from the State of California.[10]

127.   Garcia said that she has basic computer skills and cooking skills.

## Employment Record

128.   From August 2012 until the present, the defendant has been employed as a food preparer and cook for Homeboy Industries.[11] She earns $1,100 per month.[12] Her employers know of the offense.[13]

---

[8] Attendance at Substance Abuse Treatment, Narcotics Anonymous classes and Criminal and Gang Members Anonymous classes verified by Curriculum Coordinator at Homeboy Industries.

[9] The Primary Counselor at the Tarzana Treatment Center described the residential program as a "highly structured treatment modality."

[10] Verified by copy of certificate and GED test results, which noted that the defendant scored in the 98 percentile rank for language arts reading, 79 percentile rank for language arts writing, 38 percentile rank for mathematics, 62 percentile rank for science, and 58 percentile rank for social studies. Additionally, the Curriculum Coordinator at Homeboy Industries reported that the defendant attended multiple GED classes, and other academic classes, including creative writing classes, and life skills classes that addressed leadership, public speaking, building relationships for women, relapse prevention, parenting, yoga, and anger management.

[11] Verified by letter of reference from Executive Director.

[12] In part, verified by W-2 Wage and Tax Statement for 2013.

129. In addition to her job at Homeboy Industries, the defendant works as a volunteer at Sleep Tight. Approximately eight hours each week, she delivers food to the sober living facility.

130. From 2000 to 2012, Garcia was a stay-at-home mother. During these difficult years, she was dealing with her addiction. Further, she could not keep a job because her spouse was physically abusive, which left visible scars and bruises on her body.

131. From 2000 to 2002, the defendant was employed at Ink, a business in Culver City that sold printer ink. She earned $1,000 per month until the business closed.

132. From 1999 to 2002, the defendant was employed as a supervisor for a customer service call center operated by Genesis Incorporated located in Van Nuys. She earned $1,600 per month until she was laid off.

133. From 1996 to 1999, the defendant was employed as an administrative assistant for Lalique Incorporated located in Beverly Hills. She earned $1,200 each month until new management took over the business.

134. When questioned about the future, the defendant said that her job at Homeboy Industries is a permanent job. She also is considering accepting a job at the Tarzana Treatment Center.

**Financial Condition: Ability to Pay**

135. The financial statements, signed by the defendant, reflect the following:

**Assets**

| | | |
|---|---|---|
| Personal Checking Account | | $3.20 |
| Stocks | 2000 Jeep Grand Cherokee | $2,000.00 |
| **Total Assets** | | $2,003.20 |

**Liabilities**

| | | |
|---|---|---|
| Medical | Cedar Sinai Hospital | $1,000.00 |
| Other Liability Type | Los Angeles Co. Sup. Crt. traffic tickets (3) | $4,000.00 |
| Other Liability Type | Tmobile cellphone | $800.00 |

---

[13] The Director of Food and Beverage of Homeboy Industries reports that Garcia "always gives 100 percent and is an extremely hard worker," and "Homegirl Café and Catering feels like she is vital to our team, and if presented with the chance, we would love to make her a permanent employee of our growing business in order that she may help mentor future trainees."

| | | |
|---|---|---|
| **Total Liabilities** | | $5,800.00 |
| **Total Net Worth** | | ($3,796.80) |

**Monthly Income**

| | | |
|---|---|---|
| Salary | | $1,100.00 |
| Food Stamps/Allowances | | $450.00 |
| Other Income | tips | $50.00 |
| **Total Monthly Income** | | $1,600.00 |

**Monthly Expenses**

| | | |
|---|---|---|
| Groceries and Supplies | 3 in household | $450.00 |
| Telephone | | $75.00 |
| Gas | | $180.00 |
| Auto Insurance | | $66.00 |
| Life Insurance | | $94.00 |
| Clothing | | $200.00 |
| Medical Expenses | | $73.00 |
| Court Ordered Obligations | co-payment | $12.60 |
| **Total Monthly Expenses** | | $1,150.60 |
| **Total Monthly Cash Flow** | | $449.40 |

136.   In support of the information reported on her financial statements, the defendant provided the following documents: W-2 Wage and Tax Statement for 2013; and Form 1040 individual income tax return for 2013.

137.   Based on the Federal 1040 Income Tax Returns in tax year 2013, the defendant filed head of household, and adjusted gross income earnings of $10,258.

**Assessment of Financial Condition**

138.   The undersigned recognizes that Garcia currently has positive total monthly cash flow, likely due to the fact that she pays no mortgage or rent. However, upon release from custody, the defendant's immigration status is uncertain and she will have housing costs. As such, based on Garcia's reported financial position, her wage history, and her existing family obligations, it appears that she lacks the current or future ability to pay a fine.

24

### Assessment of Ability to Pay

139.   Immediate Payment:  None

140.   Payment Schedule:  None

## PART D. SENTENCING OPTIONS

### Custody

141.   **Statutory Provisions:**  The maximum term of imprisonment is 20 years. 21 U.S.C. § 846 and 21 U.S.C. § 841(b)(1)(C).

142.   **Guideline Provisions:** Based upon a total offense level of 18 and a criminal history category of III, the guideline imprisonment range is 33 months to 41 months.

### Impact of Plea Agreement

143.   None.

### Supervised Release

144.   **Statutory Provisions:**  The Court must impose a term of supervised release of at least three years. 21 U.S.C. § 841(b)(1)(C).

145.   **Guideline Provisions:**  The guideline term of supervised release is three years. USSG §5D1.2(c).

### Probation

146.   **Statutory Provisions:**  The defendant is eligible for not less than one nor more than five years of probation because the offense is a Class C Felony. 18 U.S.C. § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service.

147.   **Guideline Provisions:** Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. USSG §5B1.1, comment.(n.2).

### Fines

148.   **Statutory Provisions:**   The maximum fine is $1,000,000.00. 21 U.S.C. § 841(b)(1)(C).

149.   A special assessment of $100.00 is mandatory. 18 U.S.C. § 3013.

150.   **Guideline Provisions:** The fine range for this offense is $6,000 to $1,000,000. If the defendant is convicted under a statute authorizing (A) a maximum fine greater

than $250,000, or (B) a fine for each day of violation, the Court may impose a fine up to the maximum authorized by the statute. USSG §5E1.2(c)(4).

151. Costs of prosecution shall be imposed on the defendant as required by statute. USSG §5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. USSG §5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated May 17, 2014, provides the following monthly cost data:

|  | **Bureau of Prisons Facilities** | **Community Correction Centers** | **Supervision by Probation Officer** |
|---|---|---|---|
| Daily | $80.25 | $72.91 | $8.66 |
| Monthly | $2,440.97 | $2,217.73 | $263.50 |
| Annually | $29,291.62 | $26,612.76 | $3,162.03 |

### Restitution

152. Restitution is not an issue in this case.

### Denial of Federal Benefits

153. **Statutory Provisions:** At the discretion of the Court, the defendant, having been convicted of a first drug distribution offense, shall be ineligible for any or all federal benefits for up to five years after such conviction. 21 U.S.C. § 862(a)(1)(A).

154. **Guideline Provisions:** The Court, pursuant to 21 U.S.C. § 862, may deny the eligibility for certain federal benefits of any individual convicted of distribution or possession of a controlled substance. USSG §5F1.6.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

155. The probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.

## PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

156. 18 U.S.C. § 3553(a)(1):  The nature and circumstances of the offense, along with the history and characteristics of the defendant, may afford a basis for a downward variance.

157.   Garcia became involved with Homeboy Industries in August 2012. As part of her commitment to changing her life, she successfully completed a strict residential drug treatment program, passed the GED test, and acquired job skills. Garcia said that she has stayed away from active gang members. As recognized by the staff members at Homeboy Industries and those involved with her addiction recovery, Garcia has taken on the difficult task of rehabilitation with a good attitude, and she serves as a mentor to others. As verified by her reference letters, the defendant has a strong positive support network at Homeboy Industries and Tarzana Treatment Center.

Respectfully Submitted,

MICHELLE A. CAREY
Chief U.S. Probation Officer

PAMELA CHEN
U.S. Probation Officer
213-894-6022

Approved:

SUSAN JONES
Supervisor
213-894-6025

T10\GARCIA_CLAUDIA_135509_CAS_PSR